**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **GUSTAVO YANEZ,** | ) | **CIV F 03-5123 AWI TAG** |
| | ) | |
| **Plaintiff,** | ) | **ORDER ON DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| **v.** | ) | |
| | ) | |
| **CONNIE SELLERS; D.O. HELMICK,** | ) | |
| **COMMISSIONER, CALIFORNIA** | ) | |
| **HIGHWAY PATROL; MACK** | ) | |
| **WIMBISH, KERN COUNTY** | ) | |
| **SHERIFF/CORONER; EDWARD R.** | ) | |
| **JAGELS, KERN COUNTY DISTRICT** | ) | |
| **ATTORNEY, and Does 1 through 40,** | ) | |
| **inclusive,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| _____ | ) | |

_____

        This is a civil rights case brought by Gustavo Yanez that arises out of a traffic stop.  In the course of the traffic stop, a large quantity of money was found by California Highway Patrol ("CHP") Officer Connie Sellers in a box wrapped in Christmas paper.  Yanez was charged with drug related offenses, but those charges were eventually dismissed and Yanez pled to driving with a suspended license.  The money was later subject to a civil forfeiture proceeding, but Yanez appears to have prevailed in that proceeding.  Yanez brought suit against Officer Sellers in her individual and official capacity, the Sheriff of Kern County Mack Wimbish, the Kern County District Attorney Edward Jagels, and the Commissioner of the CHP, D.O. Helmick, under 42

1  U.S.C. § 1983 for violation of his Fourth Amendment rights and his Fourteenth Amendment

2  rights to equal protection and due process, 42 U.S.C. §§ 1985 and 1986 for a conspiracy between

3  all defendants to target Yanez, and those like Yanez, to arrest, seize property, and then split the

4  civil forfeiture proceeds, and Article I, Sections 7 and 13 of the California Constitution.[1]  Yanez

5  seeks both declaratory and monetary relief.  However, Yanez has dismissed all Defendants with

6  the exception of Officer Sellers in her individual capacity.  Sellers now moves for summary

7  judgment on the grounds that Yanez's rights were not violated and that she is entitled to qualified

8  immunity.  In the alternative, Sellers moves for partial summary adjudication on the issue of

9  damages.  For the reasons that follow, Sellers' motion will be granted in part and denied in part.

10

**FACTS**[2]

11      On January 29, 2002, around 9:05 a.m., Officer Connie Sellers was on patrol northbound

12  on Interstate 5 (I-5) when she observed a 1996 Chevrolet Suburban traveling southbound on I-5.

13  See DUMF No. 1.  Officer Sellers observed that the Suburban appeared to have an illegal tint on

14  its left side front window, which is a violation of California Vehicle Code § 26708(a).  See

15  DUMF No. 2.[3]  At the time, Sellers was traveling at approximately 65 m.p.h. on a rainy day and

16  at a distance vertically apart of approximately 100 ft.  See PUMF No. 43.  Sellers then made a u-

17  turn through the center divider, activated her enforcement lights, positioned her patrol car behind

18  the Suburban, and made an enforcement stop.  See DUMF No. 3.  Sellers also observed that the

19  vehicle had no rear license plate.  See DUMF No. 4.

20

21     [1]From representations made by Plaintiff's counsel at oral argument, it is the Court's understanding that

22  Plaintiff is proceeding only on claims of unlawful search and seizure under the Fourth Amendment and 42 U.S.C. § 1983.

23     [2]For purposes of this motion, the following facts are taken from both parties' undisputed facts unless

24  otherwise noted.  "DUMF" refers to Defendant's Undisputed Material Fact and "PUMF" refers to Plaintiff's Undisputed Material Fact.

25     [3]Plaintiff argues that Sellers was "not in a position to make the determination whether the vehicle had legal

26  or illegal tint at the time she made her observation."  Plaintiff further argues that the evidence relied on by Defendant is a legal conclusion and lacks foundation.  Plaintiff's argument will be discussed in another portion of this memo.

27  However, DUMF No. 2 says that the Suburban "appeared to have an illegal tint."  DUMF No.2.  The Fact does not state that the vehicle actually had an illegal tint; DUMF No. 2 is not a legal conclusion.

28

Once the Suburban was stopped, Sellers approached it from the passenger side in order to make contact with the driver, who was alone. <u>See</u> DUMF No. 5. Sellers requested the driver's license, registration, and proof of insurance. <u>See</u> DUMF No. 6. The driver, Plaintiff Yanez, retrieved his wallet from his right rear pants pocket, and gave it to Sellers. <u>See</u> DUMF No. 7. The license indicated that the driver's name was Gustavo Nuno Yanez. <u>See</u> DUMF No. 8. Sellers observed a large number of bills, approximately 20 of unknown denominations, in Yanez's wallet. <u>See</u> MTSH at 26:7-21.[4] Sellers also observed an air freshener hanging from the center of the dashboard and testified to seeing one air freshener laying on the floorboard; the odor of air freshener coming from the Suburban was "strong." <u>See</u> MTSH at 11:21-24 & 18:8-15.[5] Sellers also observed a cell phone and power cord sitting on the center console. <u>See</u> DUMF No. 11.

After receiving the license, Sellers asked for the vehicle registration and proof of insurance. <u>See</u> DUMF No. 12. Yanez retrieved the insurance paper from the glove box and gave it to Sellers. <u>See</u> DUMF No. 13. Yanez told Sellers that he had just purchased the vehicle as he indicated a temporary operating permit that was taped in the right front corner of the windshield. <u>See</u> DUMF No. 14. Sellers noticed that the permit listed Mirella M. Nuno as the owner, but did not list Gustavo Yanez. <u>See</u> DUMF No. 15. Yanez told Sellers that Mirella M. Nuno was his wife. <u>See</u> DUMF No.16.

Sellers ran a driver's license and registration check through dispatch which revealed that Yanez's drivers license was currently suspended, that Yanez had a history of convictions for driving with a suspended license, and that the registration returned with no record on file. <u>See</u>

[4]"MTSH" refers to the transcript of the motion to suppress hearing of May 16, 2002, in the underlying criminal case, No. SC083895A, filed in the Kern County Superior Court.

[5]Plaintiff states that Sellers testified that she saw two air fresheners and that the fresheners were emitting a "strong odor" from the vehicle. However, Plaintiff argues that there was actually only one air freshener hanging from the consul and that there were none on the floor board. Plaintiff cites pages 11, 18 & 36 of the MTSH and a photograph from the deposition of Sellers of the inside of the Suburban. The photo shows one air freshener hanging from the consul and something in a plastic wrapping on the passenger side floorboard. <u>See</u> Plaintiff's Exhibit F. The thing lying on the floor board may or may not be an air freshener, the Court cannot tell from the photo. Also, Sellers at other points in the MTSH referred to "the air freshener" singular. <u>See</u> MTSH at 36:4.

DUMF No. 18.[6]  Sellers requested a tow truck in order to impound the vehicle pursuant to

California Vehicle Code § 14602(a).[7]  See DUMF No. 19.[8]  Sellers also issued Yanez a citation

for violations of Vehicle Code § 14601(a) (driving with a suspended license) and § 26707(a)

(tinted windows).  See DUMF No. 20.  However, Sellers had not decided to arrest Yanez when

she learned that his license was suspended.  See MTSH 13:2-5.  After calling for a tow truck,

Sellers began a search of the Suburban.  See DUMF No. 21 and Plaintiff's Response to DUMF

No. 21.

    At some point, CHP Officer Hatfield arrived to assist Sellers.  See DUMF No. 17.  The

precise time that Hatfield arrived is disputed.  Sellers alleges that Hatfield arrived before the

inventory search began.  In fact, Sellers declares that Hatfield filled out the CHP Form 180 (the

inventory search form that CHP requires to be filled out for storage and/or impounds) while

Sellers searched/inventoried the Suburban.  See DUMF No. 21.  However, it appears that a CHP

Form 180 has never been produced and Sellers never mentioned the CHP Form 180 to Sheriff's

---

[6]Citing to the MTSH, Plaintiff argues that Sellers ran a license validity check and a warrant's check; the information returned to her was that Yanez had a suspended license.  See MTSH at 9:22-11:3.  Sellers responds that there is no inconsistency because at the hearing, she was not asked to give more details.  Sellers' declaration is more detailed than the testimony at the MTSH.  See Declaration of Connie (Sellers) Hawkins at ¶ 13.  The fact that there is more detail does not render the declaration inconsistent or a sham.  Sellers' declaration supports DUMF No. 18, and Plaintiff has not raised a genuine issue of material fact as to DUMF No. 18.

[7]Vehicle Code § 14602.6(a) reads:

> Whenever a peace officer determines that a person was driving a vehicle while his or her driving privilege was suspended or revoked or without ever having been issued a driver's license, the peace officer may either immediately arrest that person and cause the removal and seizure of that vehicle or, if the vehicle is involved in a traffic collision, cause the removal and seizure of the vehicle, without the necessity of arresting the person in accordance with Chapter 10 (commencing with Section 22650) of Division 11. A vehicle so impounded shall be impounded for 30 days.

Sellers also argues that she exercised her discretion under California Vehicle Code § 22651(p) to impound/remove the vehicle.  See Defendant's Motion for Summary Judgment at 8 n.2.

[8]Plaintiff disputes this fact by arguing that "Sellers did not decide to arrest Mr. Yanez."  See Plaintiff's Response to DUMF No. 19; see also MTSH 13:2-5.  Also, Plaintiff argues that Sellers has discretion whether to arrest an unlicensed driver and/or impound.  DUMF No. 19, reads in its entirety that, "Because Officer Sellers could not allow the unlicensed Yanez to continue to drive, she requested a tow truck in order to impound the vehicle pursuant to California Vehicle Code § 14602(a)."  Sellers had the discretion to arrest and impound, see Cal. Veh. Code § 14602.6(a), and it is undisputed that Sellers requested a tow truck in order to impound the Suburban.

4

Deputy Brewer (a Deputy who later responded to the case on behalf of the Kern County Sheriff's Department).  See Plaintiff's Response to DUMF No. 21.  Moreover, Plaintiff cites to portions of the MTSH that reflect dispatch records of the incident.  Lt. Doyle Green, the commander of the Buttonwillow substation, testified that the dispatch record showed that: (1) the stop was first reported at 9:18:23; (2) a driver's license check occurred at 9:18:38; (3) at 9:27:10, Sellers notifies dispatch that she found money in the bag (from her search of the Suburban); and (4) at 9:27:26, dispatch notifies Sellers that Hatfield is en route to assist.[9]  See Plaintiff's Response to DUMF No. 21; MTSH at 64:4-66:6.  Lt. Green was subpoenaed to appear at the suppression hearing and bring the dispatch records as the custodian of records.  See MTSH at 3:20-26. Defendant objects that information from the dispatch records are hearsay.  Also, Lt. Green testified that he was not sure whether the dispatch time accurately reflects what time Officer Hatfield arrived, that Green made an inquiry into that, and that it is possible that the dispatch entry would reflect a different time from when Hatfield actually arrived, and that the dispatcher sometimes gets busy and puts entries in later.  See MTSH at 66:3-67:10.

During Sellers's search of the vehicle, she found a red duffel bag on the right rear floor board of the vehicle.  See MTSH at 12:6-16.  Sellers opened the duffel bag and found some clothes, under which she found a package in Christmas wrap.  See id. at 12:16-19.  Sellers initially picked up the package without wearing gloves.  See id. at 30:7-13.  Because she was concerned about fingerprints, Sellers went back to her patrol car to get her gloves on.  See id. Sellers got her gloves, put them on, and went back to the Suburban.  See id.  Sellers then picked the package back up, felt the package, and "confirmed" that it felt like there were bundles of money in the package.  See id.  Sellers had testified earlier in the MTSH that, after observing the Christmas wrapped box, "I grabbed the package and felt it, and I recognized it to feel like it was

---

[9]Green also testified that the dispatch records show that Sellers requested a tow truck at approximate 9:21. See MTSH at 65:5-17.

possible U.S. currency or money."[10]   Id. at 12:22-24.  In her declaration on this motion, Sellers

simply states that the box felt like it contained bundles of money, and that this was based on

approximately 40 prior occasions where she felt money which was similarly packaged and not

visible.[11]   See Sellers Declaration at ¶ 14.  Neither Sellers' earlier MTSH testimony on page 12

nor paragraph 14 of her declaration mention gloves.  Sellers then cut open a corner of the

package with her knife and observed that the package did contain bundles of money.[12]   See

Sellers' Declaration at ¶ 15; MTSH at 30:19-23.  Sellers then placed Yanez under arrest for

further investigation into possible drug trafficking violations.  See DUMF No. 29.  In addition

and prior to finding the money in the Christmas wrapped package, Sellers declares that she had

suspected Yanez was involved in drug trafficking because: (1) she had felt what she believed to

be bundles of cash in the package; (2) the package was wrapped in Christmas wrapping even

though it was January 29; (3) the package was between clothes in the duffel bag; (4) Yanez was

traveling on I-5 which Sellers understood to be a drug corridor or pipeline; (5) Yanez appeared to

have a large amount of money in his wallet; (6) there was the strong odor of air freshener and air

fresheners themselves in the vehicle, which are often used to mask the odor of narcotics; and

---

[10]Sellers testified:
A:   I observed a red duffle bag that was on the right rear floorboard of the vehicle.  I opened th duffle bag up
     and observed that it contained several items of clothing.  I lifted a few pieces of clothing up, and then I
     observed a package in Christmas wrap.
Q:   After making that observation, what did you next do?
A:   I grabbed the package and felt it, and I recognized it to feel like it was possible U.S. currency or money.

MTSH at 12:15-24.

[11]Plaintiff requests that the Court treat Sellers's declaration concerning her 40 prior occasions as a sham
because that evidence was never introduced at the MTSH; if the evidence is considered, Plaintiff requests that
discovery be reopened so that he may question her about these occasions.
     However, the fact that she did not mention the 40 prior occasions with bundles of money does not show a
sham affidavit.  The declaration is not inconsistent with the MTSH testimony, rather it is more detailed, and Sellers
did not control the questioning at the MTSH.  If Plaintiff thinks that further discovery is warranted, he should file a
motion with the Magistrate Judge.

[12]Plaintiff agrees that Sellers "cut open the package," but argues that Sellers did not observe that the money
was "bundled."  See Plaintiff's Response to DUMF No. 26.  Defendant responds by stating that there is no factual
dispute because the declaration simply provides more detail than she was previously asked to provide at the MTSH.
The Court agrees with Defendant.

6

(7) Yanez had a cell phone and power cord in the vehicle.  See DUMF No. 25.[13]

After Sellers arrested Yanez for suspicion of drug trafficking, she discontinued her search of the vehicle and arranged to have the vehicle taken to the Buttonwillow CHP office where County sheriff's deputies would conduct a criminal drug trafficking investigation.  See DUMF No. 30.[14]  Two other officers arrived at the scene (Knight and Sgt. Laureano), and Officer Knight drove the Suburban to the Buttonwillow substation while Sellers followed in her patrol car with Yanez.  See DUMF Nos. 31-33.

At Buttonwillow, Sheriff's Narcotics Deputies Stevenson and Brewer arrived to investigate Yanez.  A K-9 unit from the sheriff's department also arrived.  The K-9 unit bit at the Christmas wrapped package, which Sellers, based on her experience around K-9 units, understood to be a positive alert for drugs.  See DUMF No. 34.  Sellers, Laureano, and Stevenson went into the CHP office and counted the money that was in the Christmas wrapped package and the money on Yanez's person; the total was $49,523.00.  See DUMF No. 35.  While Sellers and the others were in the process of counting the money, Deputy Brewer came into the CHP office and showed Sellers a .25 semi-automatic handgun and loaded magazine which he stated he had found secreted under the center console of Yanez's vehicle.  See DUMF No. 36.  At the time of the incident, Sellers had been employed by CHP as a peace officer for about 17 years and had extensive training in traffic stops and drug detection.  See Sellers' Declaration at ¶¶ 3-6.

---

[13]Plaintiffs object that DUMF No. 25 is simply self-serving argument that describes the subjective perception of Sellers.  Although Sellers may have subjectively perceived these events, under Fourth Amendment jurisprudence, probable cause is an objective inquiry that looks to the totality of the circumstances.  See Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004). This litany of "factors" by Sellers are simply part of the totality of the circumstances that may be considered from the perspective of a reasonable officer.  Plaintiff's objection is not well taken.

[14]Plaintiff argues, inter alia, that there was no inventory in the case, rather it was an investigatory search.  Plaintiff also argues that Sellers participated in the activity that occurred at the substation in conjunction with the Kern County Sheriff's Department, met with the district attorney on several occasions, and testified in the criminal matter.

This, however, does not dispute the fact that Sellers arrested Yanez and then stopped searching the car.  Nor does it dispute that sheriff's deputies would investigate.  Moreover, Plaintiff's evidence of Sellers' further participation in the case does not seem extraordinary and seems what one would reasonably expect.  It is no great surprise that Sellers, as the officer who found the money and arrested Yanez, would meet with attorneys from the district attorney's office and would testify at a criminal proceeding.

*The Suppression Hearing*

The district attorney later brought drug related charges against Yanez as well as a charge of driving with a suspended license. Yanez filed a motion to suppress evidence under California Penal Code § 1538.5. At the motion to suppress hearing, most of the above facts came out. Furthermore, although perhaps not as clear as it could have been, Lt. Green appeared to testify that, absent probable cause, it is not official CHP policy, or at least Buttonwillow substation policy, to cut packages open. Specifically, Lt. Green testified in response to questions by Yanez's counsel:

> **Q:** **So are you saying it's the local policy of the Buttonwillow that if – you leave it to the officer's discretion to determine which packages to open and which not to open?**
>
> A: I think if you have probable cause, it switches from the vehicle inventory. You could go further.
>
> **Q:** **Okay. So then you're saying absent probable cause, you wouldn't have to conduct a normal inventory search; it would not be proper to cut packages open?**
>
> A: No.
>
> **Q:** **Okay. . . .**

MTSH at 68:10-21.

After hearing testimony and argument from counsel, the trial court granted Yanez's motion to suppress. The trial court concluded that, based on Sellers' experience and training, she had probable cause to investigate the illegal tinting. See id. at 79:18-28. The trial court felt that the real issue of the case was the search of the vehicle and, in particular, the cutting open of the package. In other words, was the search an inventory search or an investigatory search based on suspicion of contraband. See id. at 80:13-16. The trial court found that Sellers did not follow proper procedure as she did not fill out the CHP 180 Form, the officer arriving on the scene (Hatfield) had the form, and that Sellers had already started the search before Hatfield arrived.[15] See id. at 80:17-25. The trial court also held, "She [Sellers] cut open a wrapped package which

---

[15]This conclusion appears to be based on the testimony of Lt. Green concerning the dispatch records.

8

would be in violation of their policy." Id. at 80:25-26.  Because the trial court believed that

opening the package violated the inventory policy, it examined whether Sellers had probable

cause to cut open the box.  See id. at 80:27-81:3.  The trial court stated that, in its belief, "there's

no possible way someone could feel this box and have any idea what was inside this box." Id. at

81:3-8.  The court determined that Seller's conclusion that there was money in the box had "no

basis" and thus, Sellers did not have probable cause to open the box. Id. at 81:9-14.  The trial

court suppressed the evidence.

From evidence filed with the Court by Sheriff Wimbish, who has been dismissed by

stipulation and is no longer a party to this case, the district attorney dismissed all charges except

for driving with a suspended license.  See Exhibits E & G in Support of Mack Wimbish's Motion

for Summary Judgment.[16]  Yanez plead *nolo contendere* to driving with a suspended license and

was sentenced.  There appears to have been no appeal filed by any party, and, as explained at oral

argument by Plaintiff's counsel, the conviction is final.  See id.  Also, there is no evidence

concerning the civil forfeiture proceeding for the $49,000, but based on representations by

Planitiff's counsel, Yanez appears to have won that action as well.

Yanez brought suit against Officer Sellers in her individual and official capacity, the

Sheriff of Kern County Mack Wimbish, the Kern County District Attorney Edward Jagels, and

the Commissioner of the CHP, D.O. Helmick under 42 U.S.C. § 1983 for violation of his Fourth

Amendment rights and his Fourteenth Amendment rights to equal protection and due process, 42

U.S.C. §§ 1985, 1986 for a conspiracy between all defendants to target Yanez, and those like

Yanez, to arrest, seize property, and then split the civil forfeiture proceeds, and Article I, Sections

7 and 13 of the California Constitution.  However, from representations made by Plaintiff's

counsel at oral argument, it is the Court's understanding that Plaintiff is proceeding only on

claims of unlawful search and seizure under the Fourth Amendment and 42 U.S.C. § 1983.

Yanez seeks both declaratory and monetary relief.  Yanez has dismissed all Defendants with the

---

[16]The exhibits are documents from the Superior Court of Kern County.  The Court takes judicial notice of these documents.  See Fed. Rule of Evid. 201.

exception of Officer Sellers in her individual capacity.  Sellers now moves for summary

judgment on the grounds that Yanez's rights were not violated, that she is entitled to qualified

immunity, and for partial summary adjudication on the issue of damages.  Yanez argues that the

initial detention, the search of his car, the search of the Christmas wrapped package, and his

arrest violated his Fourth Amendment rights and that Sellers is not entitled to qualified immunity

because there are disputed issues of material fact.

### CHP & Buttonwillow Substation Policy For Inventory Searches

CHP policy requires officers to fill out a CHP Form 180 in order to impound or store a

vehicle.  <u>See</u> DUMF No. 21 <u>and</u> Plaintiff's Response to DUMF No. 21.  Similarly, the

Buttonwillow substation of the CHP requires its officers to fill out an inventory checklist, which

is separate from the CHP Form 180, in order to impound a vehicle.  <u>See</u> MTSH at 51:10-16.

With respect to vehicle inventories, CHP's written policy reads:

4.   <u>Vehicle Inventories</u>

a.   An inventory may be conducted only after the vehicle has come into lawful
custody.  Lawful custody occurs when a vehicle is stored or impounded pursuant
to law.

b.   Employees of this Department shall inventory the contents of all vehicles which
they are storing or impounding.  The vehicle inventory is not intended to be a
search for items of evidence, but is intended to identify and list all property
contained in the vehicle being stored or impounded.  The purpose of the inventory
is to protect the property from theft, as well as to protect the Department and the
tow company from claims fo loss or theft of the property contained in the vehicle.

c.   <u>Inventory Guidelines</u>
(1)   The inventory shall include property contained in the vehicle's passenger
compartment, glove compartment, console, trunk, and any other
compartment or box which may contain property; e.g., utility
compartment, tool compartment and under the seat of motorcycles.  All
property located in these areas should be listed in the "Remarks" section of
the CHP 180.  If the glove compartment, console, trunk compartment, or
box is locked, and there is no key or mechanical/electrical mechanism to
open that area of the vehicle, departmental employees shall not force entry
into the locked area to inventory its contents.  However, departmental
employees shall note that the particular area of the vehicle was locked,
with no means to open it, in the "Remarks" section of the CHP 180.

(2)   All unsecured containers found in the vehicle shall be opened and their
contents should be listed in the "Remarks" section of the CHP 180.  If the

container is locked, and there is no key or other means to open it <u>without forced entry</u>, describe the container and note that it is locked in the "Remarks" section of the CHP 180.

d.  Items of contraband or evidence which are discovered during the inventory shall be seized and stored in the appropriate property/evidence facility.

    (1)  The description of the item seized, as well as its original location, should be noted in the "Remarks" section of the CHP 180.

    (2)  Items of evidence discovered during a vehicle inventory are admissible in a court of law.  The admissibility of such evidence has been affirmed both by the U.S. Supreme Court (Colorado v. Bertine (1987) 107 S.Ct. 738) and the California Court of Appeals, Fifth District, (People v. Steely (1989), 258 Cal.Rprtr. 699 (Cal.App. 5 Dist. 1989)).

Exhibit A to the Declaration of Steven Mills.  Sellers was aware of this policy.  <u>See</u> PUMF No. 38.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Fortyune v. American Multi-Cinema, Inc.</u>, 364 F.3d 1075, 1080 (9th Cir. 2004); <u>Jung v. FMC Corp.</u>, 755 F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to undisputed facts, it is a mixed question of law and fact.  <u>See</u> <u>Sousa v.Unilab Corp. Class II (Non-Exempt) Members Group Benefit Plan</u>, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the case turns on a mixed question of law and fact and the only dispute relates to the legal significance of the undisputed facts, the controversy for trial collapses into a question of law that is appropriate for disposition on summary judgment.  <u>See</u> <u>Union Sch. Dist. v. Smith</u>, 15 F.3d 1519, 1523 (9th Cir. 1994); <u>Sousa,</u> 252 F.Supp.2d at 1049.

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

11

in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the moving party meets it initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002). A "genuine issue of material fact" arises when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248-49; Thrifty Oil, 322 F.3d at 1046.

In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Willis v. Pacific Maritime Ass'n, 244 F.3d 675, 682 (9th Cir. 2001). However, the opposing party need not establish a material issue of fact conclusively in its favor. It is

sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; Hopper v. City of Pasco, 248 F.3d 1067, 1087 (9th Cir. 2001). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587; Mende v. Dun & Bradstreet, Inc., 650 F.2d 129, 132 (9th Cir. 1982).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Rule 56(c); Fortyune, 364 F.3d at 1079-80. The court has the discretion in appropriate circumstances to consider materials that are not properly brought to the attention of the court, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact when the evidence is not set forth in the opposing papers with adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Sousa, 252 F. Supp.2d at 1049.

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine, 210 F.3d at 1103.

1  **A.      COLLATERAL ESTOPPEL**

2      Yanez argues that Sellers should be collaterally estopped from even raising a defense as

3  to the lawfulness of her conduct.  Yanez argues that the issue of the legality of the search and

4  seizure is identical in both this Court and in the Kern County Superior Court (the suppressing

5  court) and that the issue was definitively decided on the merits when the district attorney did not

6  appeal the decision.  Yanez also argues that there is privity between Sellers and the district

7  attorney because Sellers was the principal witness at the hearing, was involved in discussions

8  related to making a decision on whether to re-file the underlying case following the granting of

9  the motion to suppress, and was involved in discussions related to trial in the underlying matter.[17]

10 Furthermore, Plaintiff argues that a finding of privity is bolstered because the actions in this case

11 were taken as part of a concerted effort in accordance with memos of understanding between the

12 CHP, Kern County District Attorney, and the Kern County Sheriff, whereby inter-agency

13 cooperation would occur for the purpose of profit sharing through civil forfeitures.

14     Sellers argues that under Ninth Circuit case law, a motion to suppress is an evidentiary

15 ruling and is not a final adjudication.  Sellers further argues that she was not a party to the

16 criminal case and is not in privity with the State in the underlying criminal action.  Thus, Sellers

17 argues that collateral estoppel is not appropriate.

18

19     *Legal Standard*

20     Federal courts must apply state collateral estoppel law when determining whether a state

21 court's judicial determination has preclusive effect in a particular § 1983 action. See Haring v.

22 Prosise, 462 U.S. 306, 313 (1983); Allen v. McCurry, 449 U.S. 90, 102 (1980); Lombardi v. City

23

24     [17]The evidentiary support for this comes from Sellers' deposition at pages 81 to 86.  However, Sellers
testified that she met with district attorney specifically about the case one time after the motion to suppress, that the

25 meeting lasted for 20 minutes, that the district attorney did not ask for Sellers' opinion about whether to refile even
though she gave it, and she was not aware whether a decision had been made whether to refile.  See Sellers

26 Deposition at 81-85. Given Sellers' involvement in the underlying facts, it is not unexpected that the district attorney
would speak to Sellers.  Also, Sellers did testify that she spoke with the district attorney for about 10 minutes

27 regarding the progress of the case after Yanez filed suit in Federal Court, but that Sellers just brought up the Yanez
case and had been at the district attorney's office on another matter.  See id. at 85:5-86:23.

28                                                                     14

of El Cajon, 117 F.3d 1117, 1121 (9th Cir. 1997).  Under California law, "a party will be

collaterally estopped from relitigating an issue only if:  (1) the issue decided in a prior

adjudication is identical with that presented in the action in question; (2) there was a final

judgment on the merits; and (3) the party against whom the plea is asserted was a party or in

privity with a party to the prior adjudication."  Kilroy v. State of California, 119 Cal. App.4th

140, 149 (2004) (quoting Clemmer v. Hartford Insurance Co., 22 Cal.3d 865, 874 (1978)); see

also Lombardi, 117 at 1121.  Suppression rulings under California Penal Code § 1538.5, "if not

followed by a conviction or an acquittal, are not final judgments under California law and

therefore are without collateral estoppel effect in a subsequent suit."  Lombardi, 117 F.3d at

1121; see also Ayres v. City of Richmond, 895 F.2d 1267, 1271-72 (9th Cir. 1990); Heath v.

Cast, 813 F.2d 254, 258-59 (9th Cir. 1987).  As to the requirement of privity in California,

"privity is a concept not readily susceptible of uniform definition."  Clemmer, 22 Cal.3d at 875.

Although privity originally dealt with a succession in interest after judgment as by inheritance or

purchase, it has been expanded to include "a relationship between the party to be estopped and

the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify

application of the doctrine."  Id.  Nevertheless, collateral estoppel may be applied only if due

process is satisfied.  Id.  As the California Supreme Court has explained:

> In the context of collateral estoppel, due process requires that the party to
> be estopped must have had an identity or community of interest with, and
> adequate representation by, the losing party in the first action as well as that the
> circumstances must have been such that the party to be estopped should
> reasonably have expected to be bound by the prior adjudication.  Thus, in deciding
> whether to apply collateral estoppel, the court must balance the rights of the party
> to be estopped against the need for applying collateral estoppel in the particular
> case, in order to promote judicial economy by minimizing repetitive litigation, to
> prevent inconsistent judgments which undermine the integrity of the judicial
> system, or to protect against vexatious litigation.

Id.

As applied to this case, it appears that there has been a final judgment, that is a

conviction.  See Lombardi, 117 F.3d at 1121; Ayres, 895 F.2d at 1271-72.  Because there has

been a conviction that has not been appealed, the case relied upon by Sellers, *Heath*, is not

controlling because that case did not involve a conviction but instead involved only a dismissal. See Heath, 813 F.2d at 255-56. Although there was a dismissal of four of the five counts in this case, one count was not dismissed after the suppression hearing and that is the count that Yanez pled to: driving with a suspended license. See Exhibit G in Support of Mack Wimbish's Motion for Summary Judgment.

With respect to privity, the Court cannot say that Sellers is in privity with the state. The evidence that Yanez relies on to establish privity is rather innocuous and does not go as far as Yanez would like. The evidence shows that Sellers met one time with the DA after the motion to suppress for 20 minutes, discussed the civil forfeiture proceeding, and gave her opinion on refiling, although her opinion was never asked for, and she was never informed of a final decision. See Deposition of Connie Sellers at 81-86. Given her involvement in the underlying facts of the case, it is to be expected that the district attorney would speak with Sellers. Furthermore, it is also clear that Sellers would be the principle witness at the suppression hearing–she stopped Yanez, searched the vehicle, found the money, and arrested him. Furthermore, Sellers was not a named party to the criminal proceeding, she had no control of the questioning, she did not have her own counsel, and she did not have the ability to appeal. Furthermore, although the district attorney does have an interest in showing that there was no constitutional violation regarding the detention, search, and arrest of Yanez, his motivation or interest is to obtain a conviction, whereas Sellers' personal interest is to avoid monetary liability. There is no evidence that Sellers had a personal stake in the outcome of the criminal proceedings. The Court does not believe that Sellers would reasonably expect to consider herself bound by the state court's suppression ruling for purposes of her own civil liability. The Court cannot conclude that finding Sellers in privity with the District Attorney/state in these circumstances, i.e. an offensive use of collateral estoppel against an individual based on the actions of an entity, is reasonable under *Clemmer* because the interests of the State are not sufficiently similar to Sellers' individual interests. See Clemmer, 22 Cal.3d at 875. Although California state law is controlling, this conclusion is in line with other jurisdictions who have considered the issue. See,

16

e.g., Kinslow v. Ratzlaff, 158 F.3d 1104, 1106 (10th Cir. 1998) (and cases cited therein); Tierney v. Davidson, 133 F.3d 189, 195 (2d Cir. 1998); Kraushaar v. Flanigan, 45 F.3d 1040, 1050-51 (7th Cir. 1995); 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4458, at 508 (1981) ("[A] judgment against a government does not bind its officials in subsequent litigation that asserts a personal liability against the officials."); see also, e.g., Davis v. Eide, 439 F.2d 1077, 1078 (9th Cir. 1971) (adverse rulings in criminal action did not preclude defendant city police officers from litigating lawfulness of search in civil action). Because there is no privity under these circumstances, collateral estoppel is inapplicable. See Lombardi, 117 F.3d at 1121.

**B.     QUALIFIED IMMUNITY**

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made," and that it is "often difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation that he faces." Estate of Ford v. Rameriz-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002). Thus, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." KRL v. Moore, 384 F.3d 1105, 1116 (9th Cir. 2004); Estate of Ford, 301 F.3d at 1049.

The first step in evaluating qualified immunity is to determine whether the plaintiff has shown conduct that violates his constitutional rights. See Butler v. Elle, 281 F.3d 1014, 1021 (9th Cir. 2002). That is, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001); Johnson v. County of Los Angeles, 340 F.3d 787, 792 (9th Cir. 2003). If "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Saucier, 533 U.S. at 201;

17

KRL, 384 F.3d at 1115; Johnson, 340 F.3d at 792.  Under the second sequential step, the court

determines: "(1) whether the violated right was clearly established, and (2) whether a reasonable

public official could have believed that the particular conduct at issue was lawful."[18]  Butler, 281

F.3d at 1021; Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993); see also KRL, 384

F.3d at 1015.

In order for a right to be clearly established, the "contours of the right must be sufficiently

clear that a reasonable official would understand that what he is doing violates that right."

Anderson v. Creighton, 483 U.S. 635, 640 (1987); Washington v. Lambert, 98 F.3d 1181, 1192

(9th Cir. 1996).  It is not necessary for the particular conduct to have been previously held

unlawful, rather it is sufficient that the unlawfulness of the conduct is apparent "in light of pre-

existing law."  Anderson, 483 U.S. at 640; Devereaux v. Perez, 218 F.3d 1045, 1052 (9th Cir.

2000).  The inquiry into whether the right is 'clearly established' must "focus on the right not in a

general, abstract sense, but rather in a practical, 'particularized' sense."  Moran v. Washington,

147 F.3d 839, 845 (9th Cir. 1998).  Accordingly, "broad rights must be particularized before they

are subjected to the clearly established test."  Id.

With respect to reasonable belief, "the relevant, dispositive inquiry . . . is whether it

would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted."  Saucier, 533 U.S. at 202; KRL, 384 F.3d at 1115.  The inquiry focuses on whether

"a 'reasonable officer' could have had the belief [that his conduct was lawful], not whether the

individual officer involved actually thought his conduct was lawful."  Washington, 98 F.3d at

1192; see also Schwenk v. Hartford, 204 F.3d 1187, 1196 n.5 (9th Cir. 2000) (noting that the

consistent approach to qualified immunity has always been to "determine whether a reasonable

officer could have believed lawful the particular conduct at issue.").  In sum, "regardless of

whether the constitutional violation occurred, the officer should prevail if the right asserted by

---

[18]The Ninth Circuit has characterized the qualified immunity analysis as both a two-part and three-part inquiry, but the particular characterization is not important.  See Schwenk v. Hartford, 204 F.3d 1187, 1196 n.5 (9th Cir. 2000).  The consistent approach of the Ninth Circuit "has always been to 'determine whether a reasonable officer could have believed lawful the particular conduct at issue."  Id. (citation omitted).

the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir.1991); see also Moran, 147 F.3d at 844.

The plaintiff bears the burden of showing that the underlying right was clearly established at the time of the alleged misconduct. See Devereaux, 218 F.3d at 1051 (9th Cir. 2000); Romero, 931 F.2d at 627. If the plaintiff shows a clearly established right, the burden then shifts to the officer to prove that his actions were reasonable, even if they did violate the plaintiff's constitutional rights. See Deveraux, 218 F.3d at 1051; Doe v. Petaluma City School Dist., 54 F.3d 1447, 1450 (9th Cir. 1995). Whether the law was "clearly established" is a pure question of law for the court to decide. See Mendoza v. Block, 27 F.3d 1357, 1360 (9th Cir. 1994); Romero, 931 F.2d at 628. Whether a reasonable officer could have believed the conduct was lawful is a question of law that can be decided on summary judgment "only if the material facts are undisputed." LaLonde v. County of Riverside, 204 F.3d 947, 953 (9th Cir. 2000); Act Up!/Portland, 988 F.2d at 872-73. If there is a "material dispute as to the facts regarding what the officer or the plaintiff actually did, the case must proceed to trial." LaLonde, 204 F.3d at 953.

### 1.      Initial Detention

Yanez argues that the initial detention violated the Fourth Amendment because it was not based on reasonable suspicion or probable cause. In particular, Yanez argues that Sellers was acting on a mere hunch when she decided to pull over Yanez. Sellers was traveling at 65 m.p.h., in the opposite direction, at a distance of approximately 100 feet away, on a rainy day. Yanez argues that Sellers never had an adequate view to determine whether the tint was unlawful prior to pulling him over. Yanez argues that it was only after Sellers had pulled him over and Sellers approached the car could she determine that the tint was illegal. Yanez argues that Sellers simply has not articulated facts that exceed mere speculation that the window tint was illegal. Yanez argues that the conditions of the initial observation of the tint create a genuine issue as to Sellers' ability to adequately view the tint.

*Discussion*

An unlawful traffic stop may give rise to a § 1983 violation.  See Haynie v. County of Los Angeles, 339 F.3d 1071, 1075 (9th Cir. 2003).  "The Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops."  Id.  "Reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' will sustain an investigative stop."  Id. (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)).  An officer's inferences must "be grounded in objective facts and be capable of rational explanation."  United States v. Colin, 314 F.3d 439, 442 (9th Cir. 2002).  Courts looks to the totality of the circumstances to "see whether the officer had a 'particularized and objective basis' for suspecting criminal activity."  Id.  "Officers are encouraged to draw upon their own specialized training and experience in assessing the 'totality of the circumstances.'"  Id.

The evidence shows that Sellers was about 100 feet away and that Yanez and Sellers were traveling towards each other at 65 m.p.h.  See DUMF No. 1; PUMF No. 43.  Yanez was in a larger sized vehicle, a Chevrolet Suburban.  Although it might have been a rainy day, the fact that Sellers was traveling 65 m.p.h. does not suggest a heavy rain.  Furthermore, 100 feet is not a particularly great distance given the size of Suburbans.  In the motion to suppress hearing, Sellers testified that "she had a very good idea" that the tint was illegal.  See Transcript of the May 16, 2002, Motion To Suppress Hearing (hereinafter "MTSH") at 23:13-17.  When asked whether Sellers knew that the tint was illegal, she responded: "Was it confirmed?  Not until after I stopped the vehicle and went out and saw that it was.  But definitely, I've done thousands of tinted windows, and they appear to be the type that I've done – seen every day and had confirmed that it was the aftermarket applied tint."  Id. at 23:18-25.  She continued that she "didn't have much doubt that it was an [illegal] aftermarket tint."  Id. at 23:26-24:1.  Also, Sellers testified she could not see into the vehicle from the driver's side window.[19]  See MTSH at 39:23-28.  Sellers also testified that the tint was dark enough that she could make out a silhouette of the driver

---

[19] Sellers did testify that the tint was "dark enough and the - - it was a cloudy, rainy day, and there wasn't a lot of light emitting through it; so I wasn't able to see very clear into the vehicle."  MTSH at 40:1-5.

when she passed the Suburban, but could not make out race or gender.  See MTSH at 41:27-

45:14.  There is no dispute that the Suburban had tinted windows.  Sellers's experience with

tinted windows, as explained at the suppression hearing, shows that she has a foundation for

believing that the windows appeared to have an illegal tint.  Given her experience with illegal

tints, the fact that she could not make out gender or race or see into the Suburban, and given her

testimony that the tinting on Yanez's vehicle looked like the tinting on other vehicles that she

determined had an illegal tint, the evidence shows more than just a "hunch."  Cf. People v.

Hanes, 72 Cal.Rptr.2d 212, 213–14 (Cal.App. Dep't Super. Ct. 1997).  Even viewed in the light

most favorable to the Plaintiff, Sellers had at least a reasonable suspicion of an illegal tint; this is

all that is required for an investigative traffic stop under the Fourth Amendment.[20]  See Haynie,

339 F.3d at 1075.  The initial detention did not violate the Fourth Amendment.

## 2.     Inventory Search/Investigative Search

Once a vehicle has been impounded, the police may conduct an inventory search without

obtaining a warrant.  See South Dakota v. Opperman, 428 U.S. 364, 369 (1975). The reasons for

conducting the inventory search are threefold: (1) the protection of the vehicle owner's property;

(2) the protection of police against claims by the owner; and (3) the protection of the police from

potential danger.  See Id.; United States v. Wanless, 882 F.2d 1459, 1463 (9th Cir. 1989).

However, in order to ensure that the inventory search is "limited in scope to the extent necessary

to carry out the caretaking function," it must be carried out in accordance with the standard

procedures of the local police department.  Opperman, 428 U.S. at 375; Wanless, 882 F.2d at

1463; see also Colorado v. Bertine, 479 U.S. 367, 374 n.6 (1987).  Inventory searches are

constitutional if they are conducted in accordance with the standard procedures of the agency

conducting the search or come under another exception to the Fourth Amendment warrant

---

[20]At oral argument, Defendant for the first time argued that Plaintiff could not challenge the initial detention based on *Heck v. Humphrey*.  Although it appears that Defendant makes a valid argument, see Guerrero v. Gates, 357 F.3d 911, 916-918 (9th Cir. 2004), Defendant did not raise *Heck* in its written submissions to the Court and Plaintiff had no opportunity to respond to this argument.

requirement.  See United States v. Ramos-Oseguera, 120 F.3d 1028, 1036 (9th Cir. 1997).[21]  Any

discretion in conducting the inventory must be "exercised according to standard criteria and on

the basis of something other than suspicion of evidence of criminal activity."  Bertine, 479 U.S.

at 375; United States v. Mancera-Londono, 912 F.2d 373, 375 (9th Cir. 1990).  "Thus, while

policies of opening all containers or of opening no containers are unquestionably permissible, it

would be equally permissible, for example, to allow the opening of closed containers whose

contents officers determine they are unable to ascertain from examining the containers'

exteriors."  Wells, 495 U.S. at 4; United States v. Penn, 233 F.3d 1111, 1115 (9th Cir. 2000).  An

inventory search is improper if the evidence shows that the search was not conducted in

accordance with the standard procedures of the appropriate agency.  See Wanless, 882 F.2d at

1463-64.  An inventory search must not be a ruse for a general investigatory search to discover

incriminating evidence.  See Florida v. Wells, 495 U.S. 1, 4 (1990); United States v. Bowhay,

992 F.2d 229, 231 (9th Cir. 1993); see also United States v. Morales-Cervantes, 219 F.3d 882,

889-90 (9th Cir. 2000) (noting that searches done for a special purpose and that do not require

probable cause may still violate the Fourth Amendment if the search is done with an intent or

purpose that is different than the accepted special purpose).  Even if an inventory search is

conducted in part with an investigatory intent, the inventory search will be permissible if the

officer's conduct would have been the same regardless of the impermissible intent.  See Bowhay,

992 F.2d at 231.

   *Discussion*

       Constitutional Violation

       There is a disputed issue of fact as to when Officer Hatfield arrived.  The Court is not

persuaded by the objection that the information from the dispatch log is inadmissible hearsay.

For summary judgment purposes, the evidence must be admissible at trial, but need not be

presented in an admissible form during summary judgment.  See Fronseca v. Sysco Food

---

[21]Overruled on other grounds by *United States v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000).

Services of Ariz., Inc., 374 F.3d 840, 846 (9th Cir. 2004); Fraser v. Goodale, 342 F.3d 1032, 1037 (9th Cir. 2003).  It is possible that the dispatch records, or the contents of the dispatch records, could be admitted at trial under Hearsay Exceptions 803(5) (recorded recollection), 803(6) (business records), or 803(8) (public records or reports).

Although Sellers declares that Hatfield was present and filling out the CHP 180 while she was conducting the inventory, the dispatch record, as described through the testimony of Lt. Green, indicates that Sellers had already opened the Christmas wrapped package when dispatch informed Sellers that Hatfield was en route.[22]  If Hatfield arrived before Sellers began the search of the vehicle and also filled out the CHP Form 180 while Sellers searched, this would indicate compliance with CHP policy.  The issue would then become whether Sellers violated CHP policy by cutting open the package.  However, if Hatfield did not arrive until after Sellers had cut open the wrapped package, then this would indicate non-compliance with CHP policy.  If Hatfield was not present and filling out the CHP Form 180, then this indicates an investigative search that requires probable cause.[23]  See Wells, 495 U.S. at 4; Morales-Cervantes, 219 F.3d at 889-90.

_____

[22]Although not binding on this Court, the state court concluded that Hatfield had not yet arrived.

[23]Sellers relies on Paragraph 14 of her own declaration, page 26, lines 11-22 of the deposition of Yanez, and Paragraphs 5 and 6 and Exhibit A of the declaration of Steven Mills for the proposition that, "Officer Hatfield began to fill out the CHP 180 (impound form) as Officer Sellers began to inventory the vehicle's contents as required by the CHP policy."  DUMF No. 21.
   The evidentiary support for DUMF No. 21 is insufficient to establish the fact as undisputed for this motion. The cited portions of Mills' declaration deal with the impound policy and the propriety of cutting open the package, they do not mention Officer Hatfield.
   The deposition excerpt from Yanez reads:
   Q:     Did Officer Sellers or the man officer look at what was in your car?
   A:     I think they were looking at the car.
   Q:     Were they looking at the items that were inside of your car?
   A:     Like what things inside the car.
   Q:     Whatever might be in there.
   A:     They were looking inside the car.
   Q:     Okay.  When you were outside the car and the two officers were looking in your car, what did you see them doing?
   A:     They were looking in the car.
November 29, 2004, Deposition of Gustavo Yanez at 26:11-22.
The problem with this excerpt is that there is no indication of timing.  In summary judgment, evidence is viewed in the light most favorable to the non-moving party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall, 350 F.3d at 1065.  Because there is no reference to timing, this testimony is ambiguous and could refer to a

With respect to the package, it was wrapped in Christmas paper.  The CHP policy on opening containers is that all containers are opened.  See Exhibit A to Mills Declaration.  The policy states that if the container is "locked" and there is no "key or other means to open it without forced entry," then the officer is to describe the container and note that it is locked under the "Remarks" section of the CHP 180.[24]  See id.  A wrapped package would not seem to be a "locked" container.  However, cutting the box open would seem to be a form of "forced entry."  Furthermore, Lt. Green testified that cutting open a wrapped package is contrary to the inventory policy.  The trial court also found that cutting open the package was a violation of CHP policy.  Viewed in the light most favorable to Yanez, Lt. Green's testimony could show a violation of the policy by cutting open the box.

Since some evidence indicates that the inventory policy was not followed with respect to the search of the Suburban and the search of the package, this indicates an improper search under the Fourth Amendment.  Viewed in the light most favorable to Yanez, the non-moving party, it is possible that there is violation of the Fourth Amendment.

Irrespective of the inventory policy, a police officer may search a vehicle and its containers if the officer has probable cause to believe that there is evidence or contraband contained therein.  See Wyoming v. Houghton, 526 U.S. 295, 302 (1999); California v. Acevedo, 500 U.S. 564, 580 (1991).  Probable cause to search exists when the facts and circumstances known to the officer are sufficient to warrant a reasonable person to conclude that contraband or evidence of a crime will be found.  See Ornelas v. United States, 517 U.S. 690, 694 (1996);

time either before or after Sellers opened the package.

Finally, Sellers' declaration does state that Hatfield was filling out the CHP Form 180 as Sellers searched and found the Christmas wrapped package.  See Declaration of Connie (Sellers) Hawkins at ¶ 14.  However, as explained above, this is inconsistent with the content of the dispatch log as testified to by Lt. Green.  Simply stated, DUMF No. 21 is disputed.

[24]At oral argument, counsel for Sellers explained that the CHP policy on locked containers was in response to the monetary cost of prying open, for example, the lock of a glove compartment.  This is confirmed in the declaration by CHP Officer Steven Mills, a non-retained expert witness.  See Declaration of Steven Mills at ¶ 5.  However, the declaration does not state that CHP officers, and in particular Sellers, were told not to open "locked" containers because the cost of repair would become prohibitive.

United States v. Ibarra, 345 F.3d 711, 716 (9th Cir. 2003).  Where the determination of probable cause requires an inquiry into the facts and circumstances within the officer's knowledge, a factual issue is created that may preclude a determination of probable cause.  See Act Up!/Portland, 988 F.2d at 873.  Here, Sellers was confronted with: (1) a driver with a suspended license; (2) a driver with at least 20 bills of unknown denominations in his wallet; (3) the presence of at least one air freshener and the strong odor of air freshener; (3) a location at I-5, a drug corridor; (4) a cell phone; (5) a Christmas wrapped package in late January; (6) and her testimony that she felt what appeared to be bundles of cash in the box based on her experience, which she later confirmed by touch while wearing gloves.  Plaintiff argues that there is nothing unusual about traveling on I-5 with a cell phone and air fresheners and carrying 20 bills of currency of unknown denominations.  More importantly, the wrapped package was a cardboard box that was partially wrapped in duct tape and completely wrapped in Christmas paper.  Plaintiff argues that the state court examined the box and found that no one could tell what was inside the package, let alone that the package could contain bundles of money.  In other words, Plaintiff argues that there is at least a question of fact as to whether any person could tell, especially while wearing gloves, that the wrapped, cardboard package/box contained bundles of money.

The Court agrees in part with Plaintiff.  Viewed in the light most favorable to Plaintiff as the non-moving party, the facts of an air freshener and the strong odor of air freshener, a cell phone, driving on I-5, and possessing about 20 bills of unknown denominations does not constitute probable cause to search the car.  Furthermore, an air freshener and the strong odor of air freshener, a cell phone, driving on I-5, and possessing about 20 bills of unknown denominations and possession of a Christmas wrapped package in late January in a duffel bag does not constitute probable cause to search the box.  That is, the Court cannot say that, given these circumstances, a reasonable person would conclude that first, the Suburban contained contraband, and second, once the duffel bag and package was found, that the box contained contraband.  These characteristics, with the exception of a Christmas wrapped package, do not

25

seem at all uncommon.  Furthermore, although Christmas had past by a month, the Court does not find the fact that a person may still possess a Christmas package in late January so suspicious as to warrant a finding of probable cause.

However, if Sellers could actually feel bundles of money within the box, then probable cause would exist to open it under the totality of the circumstances.  Given the physical characteristics of the box, the Court concludes that there is a question of fact whether Sellers did/could feel that there were bundles of money within the package.[25]

### Established Right

Plaintiff relies on his Fourth Amendment right to be free from unlawful searches and seizures.  Plaintiff argues that the initial detention, the search of his car and package, and arrest all violated the Fourth Amendment.  There is no dispute that the Fourth Amendment right to be free from unreasonable search and seizure is specific and clearly established.

### Reasonable Belief of Lawful Conduct

Whether a reasonable officer could believe that his conduct was lawful is a question of law that may be determined on summary judgment unless the facts are in dispute as to what the officer actually did.  See LaLonde, 204 F.3d at 953-54.  Here, there is a dispute as to when Officer Hatfield arrived and whether the CHP Form 180 was ever filled out, partially or otherwise.  In other words, there is a dispute as to whether Sellers was searching while the CHP Form 180 was being filled out (indicating an inventory search) or whether Sellers searched the car and cut the box open before Hatfield even arrived (indicating an investigatory search).  A reasonable officer would know that inventory searches must be done in accordance with proper procedure, which would mean the utilization of a CHP Form 180.  Furthermore, with respect to probable cause to open the Christmas-wrapped, cardboard package, there is a question whether

---

[25]Because much of Plaintiff's argument rests on the physical properties of the package/box, Plaintiff's counsel brought the box to oral argument.  The Court declines to make any judgements regarding whether a person may or may not be able to tell the contents of this box.  However, the Court, as it did during the hearing, notes that the box felt thicker than a gift box that one may receive from a department store.  Considering the physical properties of the box, and, although not binding, the conclusion of the state court, this Court believes that there is a material issue as to whether Sellers could or could not reasonably tell the contents of the box by "plain feel."  This is a credibility issue that is best left to the jury to resolve.

Sellers could feel the contents of the package, especially while wearing gloves.  Whether she could feel the contents of the box based on her training and experience goes to the existence of probable cause to open the package.  Because there are genuine issues of material fact concerning the conduct of Sellers, the Court cannot grant her qualified immunity through summary judgment.  See LaLonde, 204 F.3d at 953-54; Acosta v. City and County of San Francisco, 83 F.3d 1143, 1147 (9th Cir. 1996); Act Up!/Portland, 988 F.2d at 872-73.

### 3.    Arrest

Sellers argues that the arrest of Yanez was supported by probable cause, and, even if not supported by probable cause, Sellers reasonably believed that she had probable cause to arrest and thus, is entitled to qualified immunity.  See Defendant's Motion for Summary Judgment at 12:6-12; 14:14-16.  Plaintiff does not expressly respond to Defendant's argument.

*Legal Standard*

"An arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983."  Borunda v. Richmond, 885 F.2d 1384, 1391 (9th Cir. 1988).  A warrantless arrest does not violate the Fourth Amendment, however, if the officers had probable cause to believe the individual had committed or was about to commit a crime.  See Picray v Sealock, 138 F.3d 767, 770 (9th Cir. 1998).  Probable cause is determined at the time the arrest is made.  See Allen v. City of Portland, 73 F.3d 232, 236 (9th Cir. 1995).  Probable cause is an objective inquiry and exists when, under the totality of the circumstances, the agents know reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense.  See Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004); Allen, 73 F.3d at 237.  As an objective inquiry, the arresting officer's subjective state of mind, except for the facts known by the officer, is irrelevant to the existence of probable cause.  See Devenpeck v. Alford, 125 S.Ct. 588, 593-94 (2004).  Where the facts and circumstances surrounding an arrest are disputed, the existence of probable cause becomes a question of fact for the jury.  See Borunda, 885 F.2d at 1391; see also Act Up!/Portland, 988 F.2d at 873.

*Discussion*

At the time of Yanez's arrest, the following information was known to Sellers: (1) Yanez had a suspended license; (2) Yanez had at least 20 bills of unknown denominations in his wallet; (3) the presence of at least one air freshener and the strong odor of air freshener, which, based on her experience is a way to mask the odor of drugs; (3) a location at I-5, a drug corridor; (4) a cell phone; (5) a Christmas wrapped package in late January that was under clothes within a duffel bag; (6) testimony that Sellers could feel what she believed to be bundled currency in the package; and (7) bundles of money found within the Christmas wrapped package.  See DUMF Nos. 25, 27.  Under § 11370.9 of the California Health and Safety Code, it is an offense to knowingly, *inter alia*, receive, acquire, transfer, or maintain an interest in proceeds in excess of $25,000 that are derived from controlled substances offenses.  See Cal. Health & Safety Code § 11370.9.[26]  The totality of these circumstances would be sufficient for probable cause to arrest Yanez under § 11370.9.  The first five facts listed above are themselves too innocuous to warrant a finding of probable cause and require facts six and seven to reach the mark.  However, as discussed above, there is evidence that fact six may be false and fact seven is itself based on conduct that a jury may find to be unlawful under the Fourth Amendment.  Given the questions surrounding facts six and seven, the existence of probable cause is a question of fact for the jury.  See Act Up!/Portland, 988 F.2d at 873; Borunda, 885 F.2d at 1391; see also Llaguno v. Mingey, 763 F.2d 1560, 1568 (en banc) (Posner, J., for plurality).  Similarly, because Sellers' conduct and the extent of the facts known to Sellers is in dispute, a grant of qualified immunity through

---

[26]Defendant was charged with violations of sections 11370.9(a), (b).  Those sections read:

(a) It is unlawful for any person knowingly to receive or acquire proceeds, or engage in a transaction involving proceeds, known to be derived from any violation of this division or Division 10.1 with the intent to conceal or disguise or aid in concealing or disguising the nature, location, ownership, control, or source of the proceeds or to avoid a transaction reporting requirement under state or federal law.

(b) It is unlawful for any person knowingly to give, sell, transfer, trade, invest, conceal, transport, or maintain an interest in, or otherwise make available, anything of value which that person knows is intended to be used for the purpose of committing, or furthering the commission of, any violation of this division or Division 10.1 with the intent to conceal or disguise or aid in concealing or disguising the nature, location, ownership, control, or source of the proceeds or to avoid a transaction reporting requirement under state or federal law.

summary judgment is inappropriate.  See LaLonde, 204 F.3d at 953-54; Acosta, 83 F.3d at 1147; Act Up!/Portland, 988 F.2d at 872-73.


## C.   PARTIAL SUMMARY ADJUDICATION ON THE ISSUE OF DAMAGES

Sellers argues that the "filing of a criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time."  Smiddy v. Varney, 665 F.2d 261, 267 (9th Cir. 1981).  Since criminal charges were filed, Sellers argues that Yanez can have no claim against her for damages suffered after the criminal complaint was filed.

Yanez responds that *Smidd*y only creates a rebuttable presumption.  Since there is evidence that Sellers gave false information, the *Smiddy* presumption does not apply in this case.

Sellers has made no reply to Yanez's opposition argument.

*Legal Standard*

"A plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations."  Borunda, 885 F.2d at 1390; see also Reich, 886 F.Supp. at 684-85.  Expenditures for legal representation during a criminal proceeding may constitute economic harm, recoverable as compensatory damages, if "proved to the jury's satisfaction to be the consequence of [defendant's] illegal conduct."  Borunda, 885 F.2d at 1390.  But, "attorneys' fees expended in defending a criminal prosecution are not recoverable from the arresting officers in a related § 1983 action if the prosecutor exercised independent judgment in deciding to prosecute."  Sloman v. Tadlock, 21 F.3d 1462, 1474 (9th Cir. 1994).  Under the rule in *Smiddy*, the "filing of a criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time."  Smiddy v. Varney, 665 F.2d 261, 267 (9th Cir. 1981).  However, the presumption created in *Smiddy* may

be rebutted by evidence that the defendant acted maliciously or with reckless disregard for the plaintiff's rights, or made false reports or gave false information to the prosecutor, omitted material information from the reports, or otherwise prevented the prosecutor from exercising independent judgment.  See Sloman, 21 F.3d at 1474; Barlow v. Ground, 943 F.2d 1132, 1136 (9th Cir. 1991); Borunda, 885 F.2d at 1390; Smiddy, 665 F.2d at 267.

*Discussion*

Here, Sellers has made only an argument concerning *Smiddy*'s presumption, although it is undisputed that criminal charges were brought against Yanez.  On the other hand, Yanez has produced evidence in the form of testimony of the contents of dispatch records that indicates that Hatfield was not present during the search, despite Sellers's testimony to the contrary.  Yanez has also raised a disputed issue of material fact whether Sellers could reasonably tell the contents of the package.  Both pieces of information are important as they ultimately show whether a lawful inventory search occurred and/or whether Sellers had probable cause to open the wrapped package.  If Hatfield was not present and Sellers could not feel the money, then suppression of evidence would be likely (and ultimately did occur).  This would seem to be the kind of information needed by a district attorney in order to exercise independent judgment on whether to pursue drug trafficking charges.  Viewed in the light most favorable to Yanez, there is sufficient evidence to raise a material dispute as to whether the district attorney exercised independent judgment in filing the charges because there is an indication that Sellers gave false information.  See Sloman, 21 F.3d at 1474; Barlow, 943 F.2d at 1136; Borunda, 885 F.2d at 1390; Smiddy, 665 F.2d at 267.  Sellers has provided no other evidence or additional argument with respect to independent judgment by the prosecutor.  Accordingly, partial summary adjudication under *Smiddy* on the issue of damages occurring after the filing of the criminal complaint is inappropriate.

**CONCLUSION**

Defendant Sellers moves for summary judgment on the grounds that no constitutional

violations occurred and that she is entitled to qualified immunity.  Sellers also moves for partial summary adjudication on the issue of damages.  Initially, Yanez argues that in light of the state court suppression hearing, collateral estoppel prevents Sellers from arguing that no constitutional violations occurred.  However, Plaintiff has failed to produce sufficient evidence to show privity between the State of California and Officer Sellers.  See Lombardi, 117 F.3d at 1121; Clemmer, 22 Cal.3d at 875.  Thus, collateral estoppel is not applicable with respect to Sellers and the state court suppression rulings.

With respect to constitutional violations and the initial detention based on suspicion of illegal tint, Sellers testified that she had extensive experience with illegal tints, that she could not see into the vehicle or make out the gender or race of the driver as she drove past, and that the tinting on Yanez's vehicle looked like the tinting on other vehicles that she has ticketed for illegal tint; this evidence shows more than just a "hunch."  Hanes, 72 Cal.Rptr.2d at 213–14.  Even viewed in the light most favorable to the Plaintiff, the evidence shows that Sellers had at least a reasonable suspicion of an illegal tint which is all that is required for an investigative traffic stop under the Fourth Amendment.  See Haynie, 339 F.3d at 1075.  There is insufficient evidence to show a violation of the Fourth Amendment based on Yanez's initial detention.  Accordingly, summary judgment on this issue is appropriate.

With respect to the searches, viewed in the light most favorable to Yanez as the non-moving party, the evidence suggests constitutional violations through improper searches of the vehicle and the box.  Also, there are disputed issues of material fact as to what time Officer Hatfield arrived at the scene, whether the proper forms/procedure was utilized, and whether Sellers could feel that the Christmas wrapped, cardboard package contained bundles of currency, especially while Sellers was wearing gloves.  Because there are disputed issues of material fact as to the conduct of Sellers, and because the evidence, when viewed in the light most favorable to Yanez, shows a violation of the Fourth Amendment, summary judgment and the granting of qualified immunity is inappropriate at this stage.  See LaLonde, 204 F.3d at 953-54; Acosta v. City and County of San Francisco, 83 F.3d 1143, 1147 (9th Cir. 1996); Act Up!/Portland, 988

F.2d at 872-73.

With respect to the arrest of Yanez, the evidence shows that Sellers was aware of the following facts:  (1) Yanez had a suspended license; (2) Yanez had at least 20 bills of unknown denominations in his wallet; (3) the presence of at least one air freshener and the strong odor of air freshener, which, based on her experience is a way to mask the odor of drugs; (3) a location at I-5, a drug corridor; (4) a cell phone; (5) a Christmas wrapped package in late January that was under clothes within a duffel bag; (6) testimony that Sellers could feel what she believed to be bundled currency in the package; and (7) bundles of money found within the Christmas wrapped package. .  See DUMF Nos. 25, 27.  There is evidence that fact six may be false and fact seven is itself based on conduct that a jury may find to be unlawful under the Fourth Amendment.  Given the questions surrounding facts six and seven, the existence of probable cause is a question of fact for the jury.  See Act Up!/Portland, 988 F.2d at 873; Borunda, 885 F.2d at 1391; see also Llaguno, 763 F.2d at 1568.  Also, there is an issue of material fact as to the conduct of Sellers and Sellers' knowledge of facts.  See LaLonde, 204 F.3d at 953-54; Acosta, 83 F.3d at 1147; Act Up!/Portland, 988 F.2d at 872-73.  Accordingly, summary judgment is inappropriate.

Finally, with respect to partial summary adjudication on the issue of damages, Defendant argues that the *Smiddy* decision insulates Sellers from any damages suffered after the criminal complaint was filed.  However, *Smiddy* creates a presumption that may be rebutted by evidence that shows that the prosecutor did not exercise independent judgment.  One of the ways to rebut the presumption is to show that the officer provided false information.  See Sloman, 21 F.3d at 1474; Barlow, 943 F.2d at 1136; Borunda, 885 F.2d at 1390; Smiddy, 665 F.2d at 267.  Viewed in the light most favorable to Yanez, there is some evidence to suggest that Hatfield was not present and filling out the CHP 180, which is contrary to Sellers' testimony, and there is a question as to whether Sellers could feel through the cardboard of the Christmas wrapped package that the package contained bundles of cash.  In other words, there is an indication that Sellers provided false information.  This is sufficient to prevent partial summary adjudication given the development of Defendant's argument.  See Sloman, 21 F.3d at 1474; Barlow, 943 F.2d at 1136; Borunda, 885 F.2d at 1390; Smiddy, 665 F.2d at 267.

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment or, in the alternative Partial Summary Adjudication, is:

1.     GRANTED with respect to Yanez's claims based on Yanez's initial detention; and

2.     DENIED in all other respects.

IT IS SO ORDERED.

**Dated:    April 22, 2005          _____/s/ Anthony W. Ishii_____**
0m8i78                                              UNITED STATES DISTRICT JUDGE